*In re* WINIFRED BRANNING, a Person Found Subject to Involuntary Therapy (The People of the State of Illinois, Plaintiff-Appellee, v. Winifred Branning, Defendant-Appellant).

Fourth District No. 4—96—0144

Argued October 16, 1996.—Opinion filed December 18, 1996.

John B. Lower and Jeff M. Plesko (argued), both of Guardianship and Advocacy Commission, of Anna, for appellant.

Patrick W. Kelley, State's Attorney, of Springfield (Norbert J. Goetten, Robert J. Biderman, and David E. Mannchen (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GREEN delivered the opinion of the court:

In this case we pass upon the constitutionality of section 2—110 of the Mental Health and Developmental Disabilities Code (Code), which states as follows:

"No recipient of services shall be subjected to electro-convulsive therapy, or to any unusual, hazardous, or experimental services or psychosurgery, without his written and informed consent.

If the recipient is a minor or is under guardianship, such recipient's parent or guardian is authorized, only with the approval of the court, to provide informed consent for participation of the ward in any such services which the guardian deems to be in the best interests of the ward." 405 ILCS 5/2—110 (West 1994).

We hold that the second paragraph of section 2—110, on its face, violates the due process clauses of the United States Constitution (U.S. Const., amend. XIV, § 2) and the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 2) because it permits invasion of the liberty interests of wards in choosing whether to undergo the treatment provided without providing adequate safeguards.

On February 14, 1996, Gwendolyn Lewis, guardian of the person and estate of respondent Winifred Branning, filed a petition in the circuit court of Sangamon County requesting approval of her consent to electroconvulsive therapy (ECT) on behalf of her ward, Branning. Court-appointed counsel for the ward requested an examination by an independent psychiatrist but the request was denied. After a hearing, the circuit court entered an order on February 26, 1996, authorizing ECT. Respondent has appealed pointing out various weaknesses in the civil procedure used. We requested the parties to brief the question of the constitutionality of section 2—110 of the Act. Because we find section 2—110 wanting in that respect, we vacate the order.

The record indicates the circuit court order granting consent was stayed and on March 12, 1996, Branning was discharged from psychiatric care and never received ECT. Presumably she would no longer be subject to the order. Accordingly, the case could be dismissed as

moot. However, mootness generally does not preclude review of proceedings under the Code. *In re Katz*, 267 Ill. App. 3d 692, 694, 642 N.E.2d 893, 895 (1994). We find this case is reviewable under both the "public interest exception" (*In re A Minor*, 127 Ill. 2d 247, 257, 537 N.E.2d 292, 296 (1989)) and the exception for cases " ' "capable of repetition, yet evading review" ' " (*Minor*, 127 Ill. 2d at 258, 537 N.E.2d at 296, quoting *Madison Park Bank v. Zagel*, 91 Ill. 2d 231, 236, 437 N.E.2d 638, 640 (1982), quoting *Sosna v. Iowa*, 419 U.S. 393, 399-400, 42 L. Ed. 2d 532, 540, 95 S. Ct. 553, 557 (1975)).

■ Three factors determine whether the public interest exception applies: "(1) the public nature of the question, (2) the desirability of an authoritative determination for the purpose of guiding public officers, and (3) the likelihood that the question will generally recur." *Minor*, 127 Ill. 2d at 257, 537 N.E.2d at 296. The only other case construing section 2—110 of the Code found this exception applicable. See *In re Estate of Austwick*, 275 Ill. App. 3d 769, 772, 656 N.E.2d 779, 782 (1995). It also applies here. Whether a guardian may authorize ECT or psychosurgery on behalf of a ward with only the requirement of court "approval" is a question of a public nature. An authoritative determination is very important because of the important interests at stake under the statute and the potential irreversible effects of incorrect decisions. And there can be little doubt that the question will generally recur, despite the paucity of appellate cases considering section 2—110 of the Code.

■ For the "capable of repetition, yet evading review" exception to apply, the reviewing court must find "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation[,] and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again." *Minor*, 127 Ill. 2d at 258, 537 N.E.2d. at 296. Again, both elements are satisfied. The treating physician in this case testified patients received between 8 and 12 ECT treatments, at a rate of three treatments per week, leaving far too short a time for a dispute to be fully litigated. Uncontradicted testimony at the hearing established that Branning had received ECT throughout her life, from when she was 14 or 15 years old to approximately two years before the hearing (at which time she was 70). It is reasonable to expect it might be determined that she would need ECT again, and—given her strenuous objections in this case—it is reasonable to expect she would not consent to any further treatments.

Accordingly, we elect to reach the merits of the case.

■ A statute is facially unconstitutional only if " 'no set of circumstances exists under which the Act would be valid. The fact that

the [statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid'" except in the context of the first amendment. *In re C.E.*, 161 Ill. 2d 200, 210-11, 641 N.E.2d 345, 350 (1994), quoting *United States v. Salerno*, 481 U.S. 739, 745, 95 L. Ed. 2d 697, 707, 107 S. Ct. 2095, 2100 (1987). Courts presume statutes are constitutional and will construe them so as to uphold them when it is reasonably possible to do so. *Wilson v. Department of Revenue*, 169 Ill. 2d 306, 310, 662 N.E.2d 415, 417 (1996). However, while "useful in close cases," this rule is " ' "not a license for the judiciary to rewrite language enacted by the legislature." ' " *Chapman v. United States*, 500 U.S. 453, 464, 114 L. Ed. 2d 524, 537-38, 111 S. Ct. 1919, 1927 (1991), quoting *United States v. Monsanto*, 491 U.S. 600, 611, 105 L. Ed. 2d 512, 524, 109 S. Ct. 2657, 2664 (1989). The requirements of due process

> "must be examined in terms of the substantive rights at stake. *** '[T]he substantive issue involves a definition of th[e] protected constitutional interest, as well as identification of the conditions under which competing state interests might outweigh it. The procedural issue concerns the minimum procedures required by the Constitution for determining that the individual's liberty interest actually is outweighed in a particular instance.' *Mills v. Rogers*, 457 U.S. 291, 299, [73 L. Ed. 2d 16, 23, 102 S. Ct. 2442, 2448] (1982) (citations omitted)." *Washington v. Harper*, 494 U.S. 210, 220, 108 L. Ed. 2d 178, 197, 110 S. Ct. 1028, 1036 (1990).

■ In other words, in determining whether a statutory procedure affords due process, we must first determine in what, if any, factual circumstances the State may overcome the individual's constitutionally protected interest, then determine whether the procedures which govern the presentation of this proof are adequate. See *Harper*, 494 U.S. at 220, 108 L. Ed. 2d at 197, 110 S. Ct. at 1036. Three factors are to be taken into account in determining what procedures are required:

> "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Matthews v. Eldridge*, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 903 (1976).

■ A "significant" due process liberty interest in refusing unwanted psychotropic medication clearly exists. *Harper*, 494 U.S. at 221-22, 108 L. Ed. 2d at 198, 110 S. Ct. at 1036-37; *C.E.*, 161 Ill. 2d at 213, 641 N.E.2d at 351; *In re Carmody*, 274 Ill. App. 3d 46, 52, 653 N.E.2d 977, 982 (1995).

We find there is at least as significant a liberty interest in refusing unwanted ECT, psychosurgery and services of an "unusual, hazardous, or experimental" nature. Indeed, the dissent in *Harper* noted that both the Supreme Court of Washington in the case under review and the Supreme Judicial Court of Massachusetts considered psychotropic drug treatment *so* intrusive that it should be treated *like* psychosurgery or ECT. *Harper*, 494 U.S. at 240-41, 108 L. Ed. 2d at 210, 110 S. Ct. at 1047 (Stevens, J., concurring in part and dissenting in part, joined by Brennan and Marshall, JJ.), citing *Harper v. State*, 110 Wash. 2d 873, 878, 759 P.2d 358, 362 (1988), citing *In re Guardianship of Roe*, 383 Mass. 415, 436-37, 421 N.E.2d 40, 53 (1981); see also *In re K.K.B.*, 609 P.2d 747, 749 (Okla. 1980).

The two "fundamental concerns" that led the Supreme Court of Illinois to find a fundamental liberty interest in refusing psychotropic medication are present in regard to performing ECT. The first, that the treatment is of a "substantially invasive nature" and has "significant side effects" (*C.E.*, 161 Ill. 2d at 214, 641 N.E.2d at 351), has already been found to exist in ECT (see *Austwick*, 275 Ill. App. 3d at 773, 656 N.E.2d at 782-83), and can hardly be gainsaid in the other services with which section 2—110 of the Code deals. The services also have the potential for misuse and subversion to "patient control rather than patient treatment" that the supreme court found in psychotropic medication (*C.E.*, 161 Ill. 2d at 215, 641 N.E.2d at 352). Finally, our legislature has recognized in section 5(a) of the Health Care Surrogate Act that "all persons have a fundamental right to make decisions relating to their own medical treatment." 755 ILCS 40/5(a) (West 1994). There is a significant liberty interest in refusing section 2—110 services.

■ The *C.E.* opinion held the State's "significant *parens patriae* interest in providing for persons who, while suffering from a serious mental illness or developmental disability, lack the capacity to make reasoned decisions concerning their need for medication" was sufficient to overcome an individual's interest in refusing unwanted psychotropic medication. *C.E.*, 161 Ill. 2d at 217, 641 N.E.2d at 353. We believe this State interest also suffices to overcome an individual's interest in refusing services under section 2—110 of the Code. However, we are unable to ascertain any other State interests of sufficient import.

As Branning has not been charged with any crime, the State has no penological interest. *Cf. Harper*, 494 U.S. at 223, 108 L. Ed. 2d at 199, 110 S. Ct. at 1037. Patient control in a nonpenological setting not only does not *support* a decision to administer ECT, but was recognized in *C.E.* as a potential *misuse* of treatment, an objective to

which it might be "subverted." *C.E.*, 161 Ill. 2d at 215, 641 N.E.2d at 352. Nor does any interest the State might have in forcing psychiatric services on those who are able to make rational decisions for themselves and do not present a danger to themselves or others overcome the individual's right to refuse medical services. See *In re Estate of Greenspan*, 137 Ill. 2d 1, 16, 558 N.E.2d 1194, 1201 (1990). Finally, the possibility that an individual might present a serious physical danger to himself or others may be dealt with by "generally accepted" services. 405 ILCS 5/2—107 (West 1994).

Accordingly, we find the objective of providing for persons who are without the capacity to make reasoned decisions regarding their need for treatment due to a serious mental illness or developmental disability is a sufficiently compelling State interest to overcome an individual's liberty interest in refusing unwanted treatments of the type section 2—110 of the Code authorizes. We find no other State interests to support the involuntary administration of those treatments.

■ For the above interest to be served, the State must show the individual is unable to make a rational decision for himself regarding treatment. Since section 2—110 of the Code does not require this to be shown, it violates substantive due process. A ward is not by definition unable to make a rational decision regarding treatment. When a court is presented with a petition for the involuntary administration of psychotropic medication, it must find by clear and convincing evidence that the potential recipient is unable to make a rational decision regarding treatment (405 ILCS 5/2—107.1(a)(4)(E) (West Supp. 1995)) even if he is under guardianship (405 ILCS 5/2—107.1(b) (West Supp. 1995)). This implies that wardship is not determinative of the question. Courts evaluating capacity under section 2—107.1 have not even listed guardianship as a factor. See *In re Israel*, 278 Ill. App. 3d 24, 36-37, 664 N.E.2d 1032, 1039-40 (1996).

The court must also find that the treatment is in fact in the recipient's best interest. However, the statute may fairly be interpreted to require this as written (see below). We also find that implicit in a treatment being in a recipient's best interest is it being the least intrusive method available.

■ The statute also violates procedural due process. Even a statute dealing with involuntary medication of a convicted criminal "cannot withstand challenge if there are no procedural safeguards to ensure the prisoner's interests are taken into account." *Harper*, 494 U.S. at 233, 108 L. Ed. 2d at 205, 110 S. Ct. at 1043. To survive a facial challenge, the procedures a statute provides must at least be adequate to authorize the liberty deprivation with respect to *some* of

the persons subject to it. See *Salerno*, 481 U.S. at 751, 95 L. Ed. 2d at 711, 107 S. Ct. at 2103; *Schall v. Martin*, 467 U.S. 253, 264, 81 L. Ed. 2d 207, 217, 104 S. Ct. 2403, 2409 (1984). Section 2—110 of the Code fails this test. All it provides is that a court must approve the guardian's consent. Even assuming the court must come to an independent determination that the procedure involved is in the ward's best interest, the statute provides insufficient protections to the ward. It does not specify the level of evidence by which anything must be proved, nor for that matter does it state *what* must be proved except that the guardian has given informed consent and believes the services are in the ward's best interest. It does not require input from any health-care professional. It provides no limit on the length of time any service may be forced on the ward. It does not require proof that the ward is unable to make a rational choice for himself. It does not even provide the "fundamental requirement of due process," an "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Matthews*, 424 U.S. at 333, 47 L. Ed. 2d at 32, 96 S. Ct. at 902, quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 14 L. Ed. 2d 62, 66, 85 S. Ct. 1187, 1191 (1965).

■*Austwick* held two protections extended by section 2—107.1 of the Code—that a guardian must prove by clear and convincing evidence that her ward lacks capacity to make the decision for himself (405 ILCS 5/2—107.1(d)(5) (West 1992) (now 405 ILCS 5/2—107.1(a)(4)(E) (West Supp. 1995))) and that the "substituted judgment" standard applies (see *C.E.*, 161 Ill. 2d at 221, 641 N.E.2d at 355)—also applied in proceedings under section 2—110. *Austwick*, 275 Ill. App. 3d at 773, 774-77, 656 N.E.2d at 782-83, 783-85. We agree that Illinois precedent allows consideration of a ward's substituted judgment even when the standard for the determination is the ward's best interests. See *Greenspan*, 137 Ill. 2d at 17-18, 558 N.E.2d at 1201-02. But we do not believe section 2—110 of the Code requires that the ward be shown to lack the capacity to make a rational decision for himself.

*Austwick* reached this conclusion by construing section 2—110 of the Code *in pari materia* with section 2—107.1 of the Code. *Austwick*, 275 Ill. App. 3d at 773, 656 N.E.2d at 782-83. Under the *pari materia* doctrine, statutes that relate to the same matter or subject should be "considered with reference to one another so that both sections may be given harmonious effect." *People v. Maya*, 105 Ill. 2d 281, 287, 473 N.E.2d 1287, 1290 (1985). The doctrine may not properly be applied in this case.

First, section 2—107.1 of the Code was enacted long after section 2—110 of the Code. While statutes may be considered *in pari materia*

even if enacted at different times (*Spring Hill Cemetery v. Ryan*, 20 Ill. 2d 608, 615, 170 N.E.2d 619, 622 (1960)), section 2—107.1 was added by an amendatory act. Pub. Act 87—124, § 1, eff. August 13, 1991 (1991 Ill. Laws 992, 993-94). An amendatory act is "to be construed as continuing in effect the unchanged portions" of the act amended (here, the Code). *Hupp v. Gray*, 73 Ill. 2d 78, 86, 382 N.E.2d 1211, 1215 (1978), citing *Gaither v. Lager*, 2 Ill. 2d 293, 300, 118 N.E.2d 4, 8 (1954). The *Gaither* rule is the sensible one in this case. The legislature could have but did not provide that the procedures required by section 2—107.1 of the Code applied to all services, including those listed in section 2—110 of the Code. The observation that psychotropic drugs and ECT share an intrusive nature and potential side effects (*Austwick*, 275 Ill. App. 3d at 773, 656 N.E.2d at 782-83) does not justify incorporating section 2—107.1 wholesale into section 2—110.

Further, the *pari materia* doctrine only applies when the statute being construed is ambiguous. *People v. 1946 Buick, VIN 34423520*, 127 Ill. 2d 374, 377, 537 N.E.2d 748, 750 (1989); Black's Law Dictionary 791 (6th ed. 1990). The *Austwick* court found section 2—110 of the Code ambiguous in its silence about whether the guardian had to prove the ward lacked the capacity to make a reasoned decision about treatment. *Austwick*, 275 Ill. App. 3d at 772-73, 656 N.E.2d at 782-83. We disagree that silence constitutes ambiguity. Courts may not usurp the legislative function by filling legislative voids under the guise of judicial interpretation. *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 83, 630 N.E.2d 820, 823 (1994); *Gabriel Builders, Inc. v. Westchester Condominium Ass'n*, 268 Ill. App. 3d 1065, 1068, 645 N.E.2d 453, 454-55 (1994).

Although not considered in *Austwick*, the requirement of court "approval" of the guardian's decision is somewhat ambiguous. It may perhaps require the court to come to an independent determination that the procedure the guardian has approved would in fact be in the ward's best interest, although we note the legislature has elsewhere expressed such conditions explicitly. See 755 ILCS 5/11a—18(a) (West 1994) ("the court may approve the making on behalf of the ward of such agreements as the court determines to be for the ward's best interests"). Even assuming the statute requires the court to satisfy itself that the procedure in question is in the ward's best interest, however, we see no reasoned basis for reading in all of the procedures listed in section 2—107.1 of the Code, which by its terms only applies to proceedings concerning the involuntary administration of psychotropic medication. Specifically, we see no justification for reading in the "limitation" (see *Solich*, 158 Ill. 2d at 83, 630 N.E.2d at 823) that

treatment may not be administered unless the ward is proved to lack the capacity to make a reasoned decision about it. A statute may not be construed "more broadly than its express language and reasonable implications." *Baker v. Miller*, 159 Ill. 2d 249, 260, 636 N.E.2d 551, 556 (1994).

■ Nor are we persuaded by the State's argument that an individual's liberty interest in refusing unwanted ECT is merely protected in a different *way* than an individual's interest in refusing unwanted psychotropic medication. The hearing to which an individual is entitled before a guardian may be named for him under section 11a—11 of the Probate Act of 1975 (755 ILCS 5/11a—11 (West Supp. 1995)) does not suffice because, as noted above, a ward does not by definition lack the capacity to make a rational choice regarding treatment. Even if a ward were by definition unable to make a rational choice, the hearing appointing a guardian would not deal with the question of whether the proposed treatment would be in the ward's best interest, on which the ward is entitled to a hearing. Finally, even if a section 11a—11 hearing would satisfy due process, section 2—110 of the Code does not require a showing that the ward availed himself of the procedural protections to which he was entitled in the guardianship proceedings. The 1989 Report of the Governor's Commission to Revise the Mental Health Code of Illinois (which proposed section 2—107.1 of the Code) noted the following with respect to guardianship proceedings:

"[T]he patient is rarely present, is rarely represented by counsel and often no guardian ad litem is appointed. *** Thus, the guardianship system seems ill suited to the task [of making treatment decisions for hospitalized mental patients] because it may result in a substantial deprivation of the rights of the patient with few procedural protections." Report of the Governor's Commission to Revise the Mental Health Code of Illinois 45 (1989).

The fact that surrogate consent may only be given by a guardian does give a ward some modicum of protection as against the intentional approval of treatments not in the ward's best interest. However, the 1976 Governor's Commission for Revision of the Mental Health Code of Illinois stated:

"[C]ourt review of the informed consent of a mentally disabled person's parent or guardian is *** necessary to ensure that the ward's best interests are really the motivating concern of the decision. Unfortunately, the preference of the parent or guardian is not necessarily identical to the best interests of the ward. The potential danger, and in some instances, the irreversibility of the techniques contemplated, demand this extraordinary protection."

Report of the Governor's Commission for Revision of the Mental Health Code of Illinois, at 32 (1976) (hereinafter 1976 Report) (comments to proposed section 2—110).

■ Nor is the statute saved by the language that a facial challenge must fail unless "no set of circumstances exists under which the Act would be valid." See *Salerno*, 481 U.S. at 745, 95 L. Ed. 2d at 707, 107 S. Ct. at 2100. This language does not mean a statute survives a facial procedural due process challenge unless it is *impossible* for it to be applied constitutionally. This would mean a statute could only fail such a challenge if it *mandated* that insufficient process be provided (*e.g.*, barred a criminal defendant from cross-examining any witnesses against him), because a court could otherwise always provide more procedural protections than the statute on its face required. Even facial review is not quite so deferential. See *Salerno*, 481 U.S. at 751, 95 L. Ed. 2d at 711, 107 S. Ct. at 2103; *Schall*, 467 U.S. at 264, 81 L. Ed. 2d at 217, 104 S. Ct. at 2409.

If by its reliance on the *Salerno* language the State instead intends to argue that Branning has no standing to challenge the statute because she in fact received adequate process, we reject that argument as well. It is correct that Branning must show she has suffered or may reasonably expect to suffer some degree of harm from enforcement of the statute. *Messenger v. Edgar*, 157 Ill. 2d 162, 171, 623 N.E.2d 310, 314 (1993). Had she received due process she could not challenge the statute. However, she did not receive due process. The proceedings were flawed in that the court did not require that it be shown that Branning did not have the capacity to make her own decision regarding ECT, nor did it provide her an independent psychiatric examination. While the State did put on some evidence of her inability to make a rational decision, the trial court nowhere appears to have retreated from its observation that because Branning was under guardianship, "essentially the issue is whether there's been informed consent to the guardian as opposed to the patient." Nor did it make any finding that Branning lacked the requisite capacity. She thus has standing.

The simple requirement of court "approval" of a guardian's informed consent is insufficient to satisfy procedural due process. To clarify what procedures are required, we look to the *Matthews* (424 U.S. at 335, 47 L. Ed. 2d at 33, 96 S. Ct. at 903) balancing test. The private interest in refusing unwanted psychiatric treatment is substantial. The State's interest is in administering treatment to those—and only those—patients who need it and are unable to make a reasoned decision for themselves. The risk of an erroneous deprivation of the private interest through the procedures used is illustrated

by this case—Branning was released less than a month after the petition was filed, without ever having been administered ECT.

 Although we see no reason for not granting the ward protesting services under section 2—110 of the Code the same procedural protections as are extended to those refusing psychotropic medications, we cannot say that due process requires all of the procedural protections granted by section 2—107.1 of the Code. At a minimum, however, the ward must receive a hearing at which he will be allowed to appear, present witnesses on his own behalf and cross-examine witnesses against him. He must receive competent assistance at this hearing, although due process does not require that the assistant be a lawyer. See *Harper*, 494 U.S. at 236, 108 L. Ed. 2d at 207, 110 S. Ct. at 1044. The ward must be shown to be unable to make a reasoned decision for himself about the treatment and the treatment must be shown to be in his best interest, which allows consideration of the ward's substituted judgment (see *Greenspan*, 137 Ill. 2d at 17-18, 558 N.E.2d at 1201-02) and includes a requirement that the treatment be the least restrictive alternative. The proof must at least be by clear and convincing evidence. See *Addington v. Texas*, 441 U.S. 418, 432-33, 60 L. Ed. 2d 323, 335, 99 S. Ct. 1804, 1813 (1979).

The ward is also entitled to an independent psychiatric examination in section 2—110 proceedings. The value of an independent examination is clear—it provides a check on the judgment of the treating psychiatrist. See *Felce v. Fiedler*, 974 F.2d 1484, 1498 (7th Cir. 1992). This valuable safeguard would support, not hinder, the State's interest in providing only that treatment that would be in a patient's best interest. The fiscal and administrative burdens are not so great as to outweigh the important protection it would provide, as evidenced by the fact that Illinois already requires it in proceedings for involuntary committal (405 ILCS 5/3—804 (West 1994)) and involuntary medication (405 ILCS 5/2—107.1(a)(3) (West Supp. 1995) (incorporating section 3—804 of the Code (405 ILCS 5/3—804 (West 1994)))). See *Felce*, 974 F.2d at 1500.

The second circuit has held due process does not require a *consulting* psychiatrist in commitment and retention proceedings in New York. *Goetz v. Crosson*, 967 F.2d 29, 34 (2d Cir. 1992). Our case differs because an independent examiner's testimony would not "by definition, favor release" (*Goetz*, 967 F.2d at 34); it would protect against both erroneous decisions to administer treatment and erroneous decisions not to administer it. *Cf. Goetz*, 967 F.2d at 34. And unlike committal proceedings (see *Goetz*, 967 F.2d at 35, citing *Addington*, 441 U.S. at 429, 60 L. Ed. 2d at 333, 99 S. Ct. at 1811), we conclude the

scales tip in favor of erring on the side of caution, and perhaps not administering ECT, psychosurgery and "unusual, hazardous or experimental services" to some who need such services in order to ensure that these potentially irreversible (see 1976 Report at 32) services are not given involuntarily to anyone whose best interest does not require it.

We wish finally to note that we do not fault the circuit court of Sangamon County for its handling of this case. Its concern for Branning's rights is clear from the record. Nor do we mean to suggest there was wrongdoing, improper motive or error on the part of Branning's guardian or treating psychiatrist. Psychiatry is an inexact science, and Branning's later release does not imply a lack of good faith in their positions at the time of the hearing. Rather, we are attempting to determine what must be done so that the result which all concerned desire, that proper treatment is provided to those unable to make reasoned decisions for themselves, may be achieved.

As we have indicated and for the reasons stated, we vacate the order of February 26, 1996, authorizing the guardian to consent to ECT upon the ward.

Vacated.

STEIGMANN, P.J., and KNECHT, J., concur.